Thank you, Your Honor. Good morning. Elizabeth Kristen from Legal Aid at Work for the Plaintiffs. I'd like to reserve five minutes for rebuttal. Hundreds of girls at Hawaii's largest public high school have, for years, endured unequal athletic facilities and conditions at their school. As just a few examples, boys, but not girls, had access to a stand-alone athletic locker room, while girls were forced to change under the bleachers or at a local fast food restaurant. These inequalities continued with respect to athletic uniforms, equipment, coaching, transportation, and a host of other factors, all of which we submit were unlawful under Title IX. The plaintiffs met all the elements of Rule 23, and the district court here erred in denying class certification, abusing its discretion. I'd like to begin with numerosity. It was undisputed that the number of current athletes in the putative class numbered over 300, perhaps as many as 400. Oftentimes, sheer numbers of class members alone are sufficient to establish numerosity under Rule 23A1, which says that the class needs to be so numerous that joinder of all members is impracticable. This court's Jordan... They seem to suggest in their brief that the number of female student athletes is not sufficient to establish the class membership, and they say on their brief that the number of current student athletes who were actually subject to the alleged Title IX violations haven't been shown. What's your response to that? I have two responses, Your Honor. First, the way that Title IX works is that it is a total program analysis, and because Title IX allows for sex segregation in athletics, the way in which the cases are analyzed is to look at the entire athletic program. All girls participating in athletics and those deterred or not able to participate because of lack of participation opportunities are all harmed under the way the Title IX statute works. My second response has to do with the idea that defendants seem to suggest that the proper class definition would be, as we submit a fail-safe class, interpreting some kind of determination of liability within the class definition. Here we submit the class definition was proper, it was tailored to the theories of liability, and it's exactly the type of class definition that has been approved of within this circuit and in other circuits for Title IX athletics cases. The numbers that you put forward, those were for the portions of the class that did not include those who were deterred. It's the other two elements of the class. Am I reading that correctly? The numbers that we put forward had to do with the current athletes, but the numbers that you'll see in excerpt of record, page 31 and 32, also show the number of girls that are representing what we call the participation gap. We submitted that that was a measure of deterred female athletes. That number was approximately 115. That's also displayed in those two charts. The participation gap... How do you determine that though? How is that determined, the deterred athletes, how is that determined? We suggested that there were two measures of deterred athletes. First, there was evidence in the record with respect to girls who had tried out for sports and had been cut, and that those athletes were not being allowed to participate because there were insufficient opportunities for girls to play. The other measure that we put forward, this participation... Can I ask you about that one though? Is that a fair assessment? I mean, you know, you might have 100 boys that try out for a football team that can only have 40 or 50, and you wouldn't think to suggest that the 50 that were cut were because of inadequate resources. It's just that's how many you can have on a team. I appreciate the example, Your Honor. With respect to Title IX though, what we're looking at is sex-based inequality. And because Title IX allows for there to be male teams and female teams... No, I understand, but you're suggesting that every female that was cut from a team counts as a deterred class member, and how do you know that they're a deterred class member as opposed to, look, the soccer team can only have 20 members, and there were 35 girls that came and tried out. How do you know... How do you... Did you distinguish on those grounds? What we did, Your Honor, is we explained Title IX's three-part test. And with respect to that, that's a measure of whether a school or an institution is failing to provide equal athletic opportunity to girls. That's a test that's been put forward and deferred to by this court in the Sweetwater case. With respect to the first part of the test, substantial proportionality, that looks at the percentage of girls enrolled in a school. It then looks at the percentage of boys enrolled in the school. And it says, what Title IX looks at is, do girls and boys then have a proportional share of those athletic opportunities? And when they don't, that's called... So your point is that when you have 50 boys that are on a football team, you can't offset that with a 20-person soccer team. You also have to count the volleyball team that, you know, put together might be... Assuming a 50-50 split at the school between boys and girls. Is that... That's what you're saying? That's right, Your Honor. What you look to is whether the total number of athletic spots being provided to boys and the total number of athletic spots being provided to girls are proportional to their enrollment. And football is a perfect example, Your Honor, because many schools offer football, which is predominantly played by boys, even if there are a few girls here and there who play football. And so that provides often hundreds of athletic opportunities for boys. And there's simply no equivalent for girls. Your evidence puts you over 300, even without getting into... Am I reading that correctly? That's correct, Your Honor. Just looking at the current athletes, we were over 300. And I have not had an opportunity to talk yet about the future athletes, which also were inherently impracticable to join under this court's Jordan precedent. And so with respect to the first factor, 23A1, we submit that the district court abused its discretion in failing to find in our favor a numerosity, both because of the number of current athletes, the deterred athletes, as well as the future athletes. Can I ask a question on class certification? And I don't know where this fits in, whether it's numerosity or commonality, but what about a And I don't know what the allegations are here. But what if that was just one team? What if that was just the water polo team that didn't have locker rooms? The girls' soccer team had locker rooms. The girls' softball team had locker rooms. The girls' lacrosse team had locker rooms. You seem to be suggesting that the discrimination that's focused on one subset of those teams, you don't have to just look at the 20 individuals that were subject to that. You look at all 300, even if they're playing a sport that, you know, seems to be equally treated. Is that your position? Or do I? Well, Your Honor, Title IX does require a total program analysis. And the reason that it does that is because there aren't exact, perfect fits between the sports offered to boys and the sports offered to girls. And Title IX provides for flexibility. A school does not have to provide the exact same sports to boys and the exact same sports to girls. Same with facilities and other parts of Title IX's treatment and benefits analysis. But what Title IX does require is to look at overall, are girls being treated unfairly and discriminatorily as compared to boys? And so you're right. But the problem with your argument is if you can find one subset of the girls that is allegedly being treated discriminatorily, your argument leads to class certifications in all of these teams, where maybe there's only 20 viable. Are you also claiming that the number of spots for girls is lower than the number of spots for boys? Are you just claiming that they have the same number of spots, but they're not getting the same benefits in those spots? We have both causes of action, Your Honor, with respect to those athletics issues. So our first cause of action is treatment and benefits. That's what Title IX calls the laundry list of all of the things that you have when you're an athlete. Locker rooms, fields, coaching, transportation, all of those treatment and benefits issues. The other second cause of action for our Title IX claims is this failure to provide equal athletic opportunity. That's the number of slots that is supposed to be substantially proportional to girls' enrollment at the school. There's two other parts to the test. Again, Title IX is flexible. It doesn't require that exact proportionality in every case. But in this case, we would argue that the school would not meet the other two parts of the test. And so to get back to your question, the reason that Title IX looks to the total program analysis is because there may be inequalities and differences among boys' and girls' teams, but also there will be differences among girls' teams. And so what it looks at is it says you have to, as an institution, overall treat girls on par with boys. And that's why class treatment in Title IX cases is particularly important. In fact, the policy interpretation that, again, this court has deferred to in a number of cases, including Ollier v. Sweetwater, talks about Title IX as a class. And so it really does look at this as a group harm. And it makes sense, again, because of the way that Title IX athletics are set up with the sex segregation. I recognize that I have only less than five minutes left. We've taken you over. You can either keep going and we'll try and see if we can give you a little bit more on rebuttal or save the time. I'd like to speak briefly to our third cause of action, the Title IX retaliation claim. Because we submit that the district court also abused its discretion in failing to certify the retaliation claims based on commonality and typicality grounds. There was one, at least one, very important common answer that was driven by these claims. And that had to do with these adverse actions that were taken against girls that we submit based on the objective test that applies that the Supreme Court in Burlington and Thompson has talked about. And Sweetwater as well. That these Title IX class-wide retaliation claims are viable. And that we presented sufficient evidence of both commonality and typicality. And the district court... Are you seeking any different relief from that claim than you're seeking from the claims you've already talked about? We're seeking declaratory and injunctive relief on all claims, Your Honor. But I do see there being a distinction between a retaliation claim and a discrimination claim under Title IX with treatment and benefits or participation opportunities. For example, we would seek declaratory judgment that retaliation occurred and an injunction against future retaliation. So the remedy would be different with respect to that claim. What is the retaliation you allege occurred? Was it something other than the deprivation of opportunities to female athletes? Yes, it was, Your Honor. There was evidence in the record about a meeting that the water polo parents and athletes had with the principal and the athletic director in February of 2018. At that meeting, the principal and athletic director threatened to cancel the water polo program and soon thereafter lost the paperwork for the team in a way that the coach felt was retaliatory. He didn't believe that it was genuine, that they had really lost all of their paperwork suddenly. Then after the lawsuit was filed in December of 2018, there was a donor to the water polo program. And there's evidence in the record that the school made it very difficult for the water polo team to get the funds that the donor wanted to contribute to the team. So there were very specific adverse actions that were alleged. So do those adverse actions extend beyond the water polo team? Because I think my concerns that I raised with regard to the prior issues, I think you've given a good answer to, but they seem particularly apt in the retaliatory position where that seems like that's a specific action. That's not like a systematic way unless you've alleged it. But you seem to say, look, the water polo team came forward and they were retaliated against. There doesn't seem to be evidence that that is a common thing against women athletes in general. It may be a common thing against athletes who complain whether they're male or female. We submit that it is a common claim and a common injury, and that it goes beyond the water polo team for a number of reasons. First, there were water polo athletes that played other sports. In fact, our class representatives were swimmers. They played soccer. So this went beyond just the water polo team. But they weren't retaliated against in their other sports. They were only retaliated, at least the allegations seem to be, they were only retaliated against as to the water polo team. They could still swim. They didn't lose the paperwork for the swim team. They didn't threaten to cancel the swim team. That's right, Your Honor. But based on the Thompson decision, Thompson v. Stainless, which is cited in Ollier v. Sweetwater, the chilling effect of retaliation and the zone of interest of retaliation law goes beyond just the... Did you say that you just relied on an allegation of class-wide chilling effect and that you didn't present any proof on that classification? What's your response to that? I disagree, Your Honor. We presented eight declarations, undisputed evidence, that, of course, covered a number of issues. But there were very specific allegations of the retaliatory effects of this action being felt beyond the class. So, for example, the CB declaration at Excerpt of Record 244-245, Paragraph 30, talked about students and parents who wanted to join the lawsuit but were scared about the repercussions from the school if they did so. And one girl who was a star athlete who wanted to win a college scholarship but didn't want to jeopardize her relationship with the school and the athletic department staff. And CB concluded, given the way the Campbell administration has retaliated against the girls' water polo team for speaking up, I'm not surprised by her decision. These were retaliatory actions taken by the principal and by the athletic director. Those were systematic practices of the school to retaliate against girls. And the evidence presented below was sufficient to find commonality and typicality. And the district court abused its discretion in failing to certify the class. Can I ask one more question about the future plaintiffs? I agree that the district court seemed to not be able to estimate them when – I mean, the rationale the district court gave is confusing and not necessarily sustainable. But you're not seeking monetary damages, right? You're just seeking declaratory judgment. So why isn't it the case then that the seniors who are graduating, being replaced by – why would the group ever expand? Because once the seniors graduate, they would theoretically not be in their class anymore because there would be no declaratory relief. So I sort of had the different idea that really the 300 is static about because you're always going to have seniors graduating and a new class coming up that would offset it. Do you have a response? We're seeking both declaratory and injunctive relief, Your Honor. And under this court's Zepeda case, it's critical to have a certified class to ensure that injunctive relief can continue and be of the proper scope. No, I understand that, but why would someone who's already graduated then be part of the class? They would seem to have lost standard once they graduate high school, certainly for an injunctive relief, but probably for declaratory relief as well. What we're talking about here is actually about the future athletes going forward. And so we're not talking at this point about people who haven't graduated yet. No, I understand, but I thought your argument was we have 300 now, but boy, in 10 years we're going to have 1,000. But my response is I don't think you will because you're always going to have a static number. When the new class comes up, the seniors are going to graduate. So 300 may be enough in and of itself, but I just don't know why we're worried about the future students when that doesn't seem to increase your numbers. Are you claiming that it will increase your numbers, or you're just claiming that that would keep the class size the same? I take your point, Your Honor, that you're talking about them effectively replacing the current athletes in the future. But the joinder of future athletes is inherently impracticable, and if you step back and look at what if this was not a certified class, how would you join all these people? No, I'm not asking about that. I'm just saying are you saying is your position we have 300, or as Judge Collins noted, above 300, and that's enough? Or are you saying we have 300, and if you don't think it's enough, it's actually going to be 500? We think 300 is enough, Your Honor, but in addition we do have these future class members that are inherently impracticable to join, so I think that may be the better way to think about them, that they're inherently impractical to join. But it doesn't increase your numerosity? It might, but that was definitely not our argument, that there would be a doubling or a tripling of these numbers. Got it. And we respectfully ask... I think we'll give you some time for rebuttal, if you don't mind. Thank you, Your Honor. Yes, thank you. Mr. Rayner? Good morning, Your Honors, and may it please the Court. My name is Ewan Rayner, appearing on behalf of the State of Hawaii Department of Education. Your Honors, this appeal is about whether the extent of the district court's discretion in determining when or when not to certify a class. And just to begin, I just want to make very clear that what we're not arguing here is that we're not arguing that the individual plaintiffs cannot proceed on their own individual Title IX claims. And we're not arguing here today that those claims are meritless. What we are arguing is that the district court, in these circumstances, it was within the court's discretion to limit the scope of the action to the claims of the named plaintiffs. And because the district court did deny the plaintiff's motion for class certification, plaintiffs on appeal have to show not just that a class could have been certified in these circumstances, but the district court actually abused its discretion in declining to do so. I assume the state urged the district court to take that position, didn't it? To deny class certification. Correct. Yes. So you took that position, you presumably are prepared to take that position and have continued to take it on appeal. So let's just get to the big question. How could it possibly be a superior way to litigate this case to deal with individual joiners rather than what seems to be a classic class-wide claim? Well, I think there's a couple of things. There's two broad points I want to make. The first is that we do, as Judge Collins I think mentioned, we do take issue with the size of the class that the plaintiffs have represented. And there's a couple of reasons we do that. And I think to understand the basis of that argument, I think it's important to look at the specific claims that plaintiffs have made. So aside from the retaliation claim, which we've addressed separately, there's two distinct Title IX claims. And the first, as the present counsel said, is the unequal treatment and benefit claim. And the second is the unequal participation opportunities claim. Am I right in reading the record that the only basis the district court gave for rejecting class certification on those claims was the numerosity claim? That's correct, yes. And the retaliation claim was rejected on commonality and typicality grounds. So 300 plus is not sufficiently large that joiner is impacted? Well, that's exactly what the district court found, yes. And the district court found that, you know, citing several cases, and the cases we cited in our brief state that there is never a magic number for class certification for numerosity. The possibility is there to joining all those individuals. I mean, this is, given the program-wide analysis under Title IX, what conceivable benefit is there in requiring that? Well, there's a couple of things. I mean, first of all, I would say that, you know, because plaintiffs have chosen the theory of program-wide discrimination, and I would point out as well that I actually disagree with the point that Title IX requires that program-wide discrimination analysis. Because in a brief, plaintiffs for that proposition rely on the OLEA, actually the district court case in OLEA, not the 9th Circuit decision. But if you look at the regulation cited by the OLEA district court, it's actually the policy interpretation of the Office of Civil Rights. What it gives is there's three separate ways to prove an unfair benefit, sorry, an unequal treatment and benefit claim. One of those is the theory that plaintiffs have chosen here to show a program-wide, the whole athletic program-wide unequal treatment. There's two other ways. One is to show that the policies of the school on their face are discriminatory. And the third way is to show that one subset or one individual component of the program is, the treatment is unequal enough to rise to a violation of Title IX itself. And, you know, our position is that under that third theory that one individual component could rise to a Title IX violation is probably the more appropriate theory here. They get to pick the theory they're asserting. And then the question is whether or not that theory, whether it has merit or not, is amenable to class-wide treatment. And the only default given is that, well, why don't you just round up all the 300 and drag them in here? And, you know, whether or not it's impossible, it certainly seems senseless. Well, I mean, I agree that plaintiffs can choose their theory. But when they move for class certification, they have to be able to back up the theory with both the allegations and the evidence that they have a class that is sufficient. No, stop, stop, stop, stop. You're saying they have to prove their case in order to get class certification? The question I posed at the beginning and the question I think Judge Collins is trying to pose is that how could it possibly be a serious and superior way to litigate this case when the numbers are 300 plus to do it with individual joinder? And I've heard lots from you, but I haven't heard anything that begins to address why class treatment would not be appropriate here, particularly given that the relief sought is declaratory or injunctive. It's not like you've got a bunch of individuals seeking individual amounts of damages and it gets complicated. This seems truly classic for class treatment. So the question I'm trying to pose to you is why is it better not to treat it as a class action? Well, there's a couple of possible answers to that. And I do acknowledge the point, you know, plaintiffs made the argument that generally when it is injunctive and declaratorily requested, then usually the standard for certification is slightly more lenient. But there's a couple of things about that. One is that the way that plaintiffs have studied their case, their claims here, it's certainly not clear to me that there would be any difference in the relief that plaintiffs are able to obtain by their individual claims versus if a class was certified. Well, that doesn't give me a reason why it's better to proceed with individual joinders. And there are practical reasons why individual joinders would be more difficult for plaintiffs to deal with. And I'll let plaintiffs' counsel speak to that. But that first where you're starting doesn't make it any better to do it individually. Do you have anything that does make it better to do it individually? I mean, all I can say is that the numerosity factor in Rule 23A.1 requires the analysis of whether joinder is impractical. And, you know, because it focuses on joinder, the... It seems like the only way you win this, to be honest. I don't see how you're going to win and say that 300... If the class is 300 individuals, it just doesn't... With the District Court of Health, it doesn't make a lot of sense, to be honest. But I'm wondering if there's an argument here that the class really isn't 300 people. Now, that might have some legs, but I haven't heard you make that argument. And maybe that's because it's not really defensive. No, and that is the argument, the first argument I'm trying to make. And so plaintiffs have asserted this theory of program-wide discrimination. But if you look at these Supreme Court cases, the Falcon case and the Dukes case that we cited in our brief, if the plaintiff's theory is this across-the-board, a program-wide discrimination, they have to be able to back up those claims for class certification with evidence to support it. Now, I would concede that just looking at the... But that's not what the District Court said. I mean, you're really arguing for us to affirm on an alternative basis. And that's the struggle, is we're looking at the District Court opinion, and it just seems to have gotten the numerosity analysis wrong. And the question is, is there some way to salvage that? And I don't... Why shouldn't they be able to say it's systematic-wide and therefore it is 300? Well, I think they could say that, and I'm certainly not saying that... But they have to have some evidence. What level of evidence do they have? They obviously don't have to prove their case. You're saying they have to have some sort of prima facie hurdle that they need to meet to show that it's not just the water polo team, but it's also the soccer team. I mean, if they come in and just say, look, the water polo team was threatened, they're being mistreated, that may be on equipment or on individual benefits, but what about the numbers? They seem to be claiming that you offer opportunities for 40% of the boys, but only 20% of the girls. That seems to be different. I mean, I would bring it up. Well, I think the two different claims, the unequal treatment and benefits claim and the unequal participation opportunities claim, should be looked at separately. And I think it's two different numbers we should be looking at. And just to move to that second claim, the unequal participation opportunities claim for a second, the numbers that plaintiffs have proposed for that, I think there's two arguments they've made. They've made the argument that I think it was 115 is the number positive, which is the number plaintiffs have calculated as the number of opportunities lacking between girls sports and boys sports overall. And the other argument they've made is that, well, we can presume that some of the existing student athletes would also want to play other sports if there were more opportunities. But the problem with those arguments, of course, is that that doesn't show how many students were deterred from participating in sports because of... As I asked your opposing counsel, we're over 300 without even getting into the deterrence issue. So you can kind of set that aside. And the question is assessing impracticability, which looks at how difficult it is to join them. It is doing this with anything. I can't see anything on the other side of the ledger that countervails the difficulty of signing on 300 and then keeping a rolling roster as class changes. I can't see any advantage on the other side to justify the practical difficulties. Well, to that point, I don't think that the numbers for that participation opportunities claim is actually the 300, because the 300 is the number of existing student athletes. But in order to get to a claim where students would participate in opportunities if the opportunities were there, we need to have some idea of how many of those students were deterred. And I think it's telling that only one out of the four named plaintiffs actually make a claim that they would... Do you think that the two claims that were disposed of just on numerosity have to have a different treatment? I'm sorry. I'm sorry, Your Honor. Could you repeat that? I'm getting confused by your argument. You know, we're not talking about the retaliation claim. We're talking about the other claims that were rejected just on numerosity. Are you saying that those claims have to have a different... I believe they should, because they're very different claims. Did you argue that in your brief, in your red brief? Well, we argued the participation opportunities claim separately. We had a separate section in our brief for that. And we argued that plaintiffs basically hadn't shown the number of students that were deterred from participating in sports. And that included the potential students that are not yet athletes, and also included students that are currently athletes that might play other sports. And that's actually the exact argument that was made in the SD versus Jordan School District case that we cited in our brief. How does this come up at the stage of class certification? I mean, we've got maybe multiple claims that have multiple different numbers of people affected. But the district court's order didn't talk about any of that. Indeed, the district court's order acknowledged we may be talking about more than 300. It went off entirely on, but it's not impractical to round them all up, a position that you don't seem to defend, and for good reason, because I don't think it's particularly defensible. So how is it we're supposed to delve into the merits of each individual claim and try to decide at this stage, long before proof of injury, how many people have been hurt? I mean, the class certification comes early. And there just seems to be no benefit cited by you so far as to why treating these claims with individual joinders is a superior method of litigation. What makes us dig any deeper than that? Well, I mean, you know, I think we're relying on the U.S. Supreme Court cases in Falcon and Goot. And they do require the courts to dig a little deeper than just looking at the allegations. They do require some proof of across-the-board discrimination where that is the theory that's asserted. Well, we have that allegation and at least some degree of logic behind the allegation that's been offered. The fact that there may be variations on a theme, I mean, you're prepared to litigate on behalf of plaintiffs on different theories. And the different theories might result in different numbers. But that still doesn't tell me why, with the district court not disputing more than 300 as the number, why isn't that the one we should be looking at? Well, because, I mean, simply we're asking the court to look at alternative grounds for affirming. Certainly that's what we're doing. And, you know, as we argued in our brief, you know, the first argument we make is that we don't necessarily agree with plaintiffs that the 300 to 400 is the appropriate number for the claims they've actually asserted. And more specifically, that are both common and typical with the named plaintiff claims. Because by definition, the named plaintiffs can only represent claims which have common questions with theirs and where their claims are typical of the rest of the class members. I see my time is up. Can I ask you a question about your response on the Ollier case, which seems a bit of an obstacle on the retaliation? Yeah, I mean, our argument on Ollier is that Ollier is essentially a standing case. Class certification wasn't an issue at all in the Ollier appeal. I recognize that class certification wasn't an issue. The problem is that Ollier seems to say things about the nature of the substantive law that make it look susceptible to class-wide treatment. That's the argument and the concern, as I see. Because it says, in terms of saying that the remedy was over-broad, that, well, actually everyone is affected and benefits from this. What is your response to that? Well, I mean, we acknowledge, you know, explicitly in our brief, that we acknowledge that that is a viable theory. We don't deny that there can be a retaliation claim that goes beyond just the individuals that were retaliated against. Does that echo to the merits? I mean, because the nature of retaliation, particularly in this kind of a situation, is that the first one who raises their head over the crowd gets it lopped off and it's like, anybody else want to try that? That's the theory of a retaliation claim and why one incident can have a class-wide effect. It goes to the merits whether they can prove that. I think it also goes to the commonality and typicality questions. And I think there's two things about the Ollier case. One is that here there is nothing beyond the allegation. I mean, opposing counsel pointed out some statements in the declaration. But none of those statements go towards the specific actions that are the basis of the retaliation claim. And the other thing, I mean, I think the thing in Ollier as well is that the action that was challenged as a retaliatory action was the firing of the coach for reporting a Title IX violation, which I think is a much more severe action than what's at issue here. And so to the extent that Ollier, I don't think it does, but to the extent that Ollier states that that's a basis for class certification without any supporting evidence, just on the allegations, I think it wouldn't necessarily apply to the type of action that's alleged here. And I see I'm out of time, so we respectfully ask the court to affirm the district court's decision. Thank you, counsel. Ms. Preston, we'll give you two minutes for rebuttal. Thank you, Your Honor. The defendants never made the argument below that there was something wrong with plaintiff's numbers, that there weren't at least 300 girls who were current athletes. The district court found that there's evidence in the transcript that basically defendants counseled from the other defendant, and all but conceded that numerosity was met with these numbers. And plaintiffs certainly, as Judge Collins points out, do get to pick the theory here, and the theory is that there is class-wide discrimination and retaliation, that the evidence below supported it, and that the district court abused its discretion in failing to find under Rule 23A1 that the class was not so numerous that joinder of all members was impracticable. The district court decision is not salvageable. In response to their argument that a distinction should be made between the non-retaliation claims, and they have to be analyzed separately for purposes of numerosity. I have not seen this argument from them before, Your Honor, but I think with respect to numerosity, the type of claim doesn't necessarily matter. They've made arguments about our class definition. They've tried to say your class definition is wrong, it should be different, it should include a theory of liability within it. But this is a very typical class definition for these Title IX athletics cases, and we submit that it was a proper definition that actually applies across all of the three claims. With respect to Sweetwater, we acknowledge it was not squarely a class certification decision, although it was appealed and the defendants waived that issue on appeal, as the Sweetwater opinion discusses in the footnotes. However, Sweetwater was about more than just a firing of a coach. Sweetwater involved a parent of a softball girl who spoke to the athletic director about inequality for girls in that program, and in retaliation the school fired the coach and took other actions against the softball team, including not letting parents volunteer, including not holding banquets for the girls and giving them their varsity letters. So it went way beyond the coach being terminated, although certainly termination of a coach is a form of retaliation. But Sweetwater does cite Thompson and says that it's not a viable argument for Sweetwater to complain that only some members of the plaintiff's class who attended Castle Park High School when complaints were made can engage in protected activity. That the class includes students who were not members of the softball team at the time of retaliation and who benefit from the relief does not impair the validity of the relief. Again, acknowledging it wasn't squarely on class certification, but Sweetwater is very much on all fours with this case with respect to the type of analysis that was made there, and we submit that the district court also erred in denying class certification on commonality and typicality grounds with respect to the retaliation claims. And we respectfully ask that you reverse and remand with instructions to certify the class. Thank you, Your Honor. Thank you. Thank you to both counsel for your preparation and your arguments today. The case is now submitted.
judges: Clifton, Nelson, Collins